The Supreme Court of the State of Colorado 
2 East 14th Avenue • Denver, Colorado 80203
2016 CO 38
Supreme Court Case No. 15SA292 
Appeal Pursuant to § 1-1-113(3), C.R.S. (2015) 
Mesa County District Court Case No. 15CV30710 
Honorable David A. Bottger, Judge
Petitioners-Appellants: 
Kent Carson, James “Gil” Tisue, and Dale Pass, 
v. 
Respondents-Appellees:
Sheila Reiner, as Clerk and Recorder for the County of Mesa, State of Colorado; and Terri 
Wells, as Designated Election Official for Mesa County Valley School District 51,
and
Intervenor-Appellee: 
Paul Pitton.
Judgment Affirmed 
en banc
May 23, 2016
Attorneys for Petitioners-Appellants:
KBN Law, LLC
Mario D. Nicolais, II Lakewood, Colorado
Attorneys for Respondent-Appellee Sheila Reiner:
J. Patrick Coleman, Mesa County Attorney
Andrea Nina Atencio, Chief Deputy County Attorney—Civil Division Grand Junction, Colorado
Attorney for Intervenor-Appellee:
Dufford, Waldeck, Milburn & Krohn, L.L.P.
William S. DeFord Barbara R. Butler
Grand Junction, Colorado

Attorneys for Amici Curiae of Shannon Antonucci, Noelle Westcott, and Wayne
Westcott:
Tierney Paul Lawrence LLP
Edward T. Ramey
Denver, Colorado
Attorneys for Amicus Curiae Colorado Secretary of State:
Cynthia H. Coffman, Attorney General
Frederick R. Yarger, Solicitor General
LeeAnn Morrill, First Assistant Attorney General
Matthew D. Grove, Assistant Solicitor General
W. Eric Kuhn, Assistant Attorney General
Denver, Colorado

JUSTICE COATS delivered the Opinion of the Court. JUSTICE EID dissents.

¶1 Carson and two other electors of Mesa County Valley School District 51 made
application to this court, pursuant to section 1-1-113(3), C.R.S. (2015), for review of the district court’s order denying their requested relief concerning a school board election. A week before the scheduled election, Carson filed a verified petition, pursuant to section 1-1-113(1), naming as respondents the county clerk and recorder and the school board’s designated election official, and seeking a declaration that one of the candidates for the school board was unqualified and had been wrongfully certified to the ballot. In addition, the petition sought an order forbidding the clerk and recorder from counting votes for that candidate. The district court denied the requested relief on the grounds that section 1-1-113(1) did not authorize it to adjudicate the eligibility of a candidate at that stage of the election process.
¶2 Because section 1-1-113(1) does not permit a challenge to an election official’s 
certification of a candidate to the ballot, solely on the basis of the certified candidate’s qualification, once the period permitted by section 1-4-501(3), C.R.S. (2015), for challenging the qualification of the candidate directly has expired, the ruling of the district court is affirmed.
I.
¶3 On October 27, 2015, one week before the November 3 regular biennial school
board election for Mesa County Valley School District 51, three registered electors of the school district, Kent Carson, James “Gil” Tisue, and Dale Pass, filed a verified petition with the district court, challenging as wrongful the certification of one of the candidates. The petition indicated that it was filed pursuant to section 1-1-113(1), C.R.S. (2015), and it sought a judicial determination and declaration: (1) that Paul Pitton, a certified candidate for school board director of District B, was unqualified to be a candidate for that office; (2) that the designated election official committed a wrongful act in failing to verify Pitton’s residence before certifying him to the ballot; and (3) that the clerk and recorder must not record or tabulate ballots marked for Pitton. The petition named as respondents the Clerk and Recorder for Mesa County, Sheila Reiner, and the district board of education’s designated election official, its secretary Terri N. Wells.
¶4 The district court heard the petition on November 2, 2015, the day before election 
day. The underlying facts were stipulated by the parties. The Mesa County Valley School District, which operates under a director district plan of representation requiring school board director candidates to reside in the district the candidate in question seeks to represent, see § 22-31-107(1), C.R.S. (2015), is split into five separate, non-overlapping geographic areas within the school district, comprising the director districts known as Districts A–E. In August, intervenor Paul Pitton appeared before Wells, the designated election official, and after signing them, filed various documents, including an Affidavit of School Director Candidate on Qualifications for Office, affirming that he met all qualifications to run for the school director seat for District B. Wells then provided Pitton with nomination petitions.[1] Within the time period permitted by statute, Pitton submitted the completed petitions to Wells, as the designated election official, who
1 Pitton contends he and the designated election official referred to an outdated director district boundary map, and neither realized that Pitton’s address was not within the District B boundaries; during argument, petitioners’ counsel asserted to the district court that he, likewise, did not believe Pitton had intentionally misrepresented his qualifications in his candidate affidavit.

determined them to be sufficient, subject to verification of petition signatures. Wells, in turn, submitted the petitions to the Mesa County Elections Division for signature verification, pursuant to an Intergovernmental Agreement with the Mesa County Clerk and Recorder. After receiving notice from the Elections Division that the signatures on all completed nomination petitions for District B candidates had been verified, Wells provided the Division with a list of the candidates, including Pitton, who should appear on the ballot. None of those filing the verified petition in the district court formally challenged Pitton’s eligibility to be a candidate before filing their section 1-1-113(1) petition.
¶5 Ruling from the bench, the district court denied the relief requested in the 
petition, finding that section 1-1-113(1) did not authorize adjudication of Pitton’s eligibility as a candidate at that stage in the election cycle. Instead, it ordered that the election be allowed to proceed. Petitioners immediately filed an application for review in this court, pursuant to section 1-1-113(3).
II.
¶6 Section 1-1-113(3), C.R.S. (2015), provides that upon application within three
days, district court proceedings pursuant to subsection (1) may be reviewed and finally adjudicated by this court, unless the court, in its discretion, declines jurisdiction. We choose not to decline jurisdiction in this case, largely because it represents the third time in less than two years in which we have been presented with a scenario involving a certified candidate in a non-partisan school board election who, before election day, has been discovered to indisputably reside outside the district, but who nevertheless declines to withdraw; and it squarely presents a question concerning the interpretation of section 1-1-113(1), expressly reserved by this court in its earlier cases.
¶7 In a pair of cases arising from a single school board election and concerning the 
qualifications of the same candidate, Speers, we addressed two different attempts to avoid the declaration of a vacancy in the office, which would then be filled by the sitting school board, according to separate statutes governing school board vacancies. See Figueroa v. Speers, 2015 CO 12, 343 P.3d 967; Hanlen v. Gessler, 2014 CO 24, 333 P.3d 41. As in the case before us today, sometime before election day it was discovered that despite being certified to the ballot, one of the candidates for school board director did not reside within the district in question, as required to be eligible for election to the seat. After that candidate nevertheless refused to withdraw as requested, the Colorado Secretary of State promulgated a rule mandating that “[i]f the designated election official determines, after ballots are printed, that an individual whose name appears on the ballot is not qualified for office, the votes cast for that individual are invalid and must not be counted.” Hanlen, ¶ 12, 333 P.3d at 44. The Secretary justified the emergency rule as necessary to fill what he deemed a “gap” in the election code, resulting from the code’s silence as to whether election officials may count votes cast for an ineligible candidate when that candidate’s ineligibility is discovered prior to election day. Id. at ¶ 20, 333 P.3d at 46.
¶8 In upholding the district court’s determination that the Secretary acted in excess 
of his authority, we held that the rule conflicted, at least in part, with a statutory provision requiring, under specified circumstances, votes for a disqualified candidate in a partisan election to be counted, see § 1-4-1002(2.5), C.R.S. (2015), but also that the “gap” in the election code postulated by the Secretary did not actually exist. See Hanlen, ¶¶ 39–44, 333 P.3d at 50–51. We reasoned that when read as a whole, the statutory scheme evidences an intent that challenges to the qualifications of a candidate be resolved only by the courts, either immediately after certification to the ballot, permitting an unqualified candidate to be barred from appearing on the ballot in the first place, see § 1-4-501(3), C.R.S. (2015), or after completion of the election, in an election contest challenging the eligibility of the candidate who wins the election to hold the office to which he was just elected, see § 1-11-201(1)(a), C.R.S. (2015). By providing the latter opportunity for an election contest, we found that the legislature expressly contemplated the situation in which an ineligible candidate could be elected to office, and it addressed that scenario by allowing any eligible elector to challenge, after the election, the winning candidate’s eligibility to serve.
¶9 Given the limited question before us, concerning the validity of the Secretary’s 
emergency rule, we expressly declined to opine on the merits of a post-election challenge to the eligibility of Speers to hold office and, if ineligible, whether the office should be declared vacant or whether the next highest vote-getter should be declared the candidate who was legally elected. We did, however, conclude that this statutory framework “reflects the legislature’s recognition that once ballots are printed and distributed, and voting is underway, the election process must be allowed to proceed, and any late-arising issues regarding a candidate’s eligibility are to be resolved through a post-election contest.” Hanlen, ¶ 44, 333 P.3d at 51.

¶10 With regard to the questions whether Speers was eligible to hold office and, if not, whether Figueroa, the other candidate on the ballot, was instead the one who was legally elected, Figueroa filed a separate election contest in the district court, pursuant to section 1-11-201. Figueroa asserted that Speers’s failure to reside in the district made her ineligible to hold office, and because she was ineligible to hold office, she could not be considered “legally elected” within the contemplation of the statute, despite having received the most votes. Figueroa, ¶ 6, 343 P.3d at 969. Rather than declaring a vacancy in office, which would be filled by the sitting board, see § 22-31-129(2), C.R.S. (2015), Figueroa argued that the votes for Speers should therefore be nullified and that he, as the runner-up, should be found to have been legally elected. Figueroa, ¶ 6, 343 P.3d at 969.
¶11 In that case, where Speers had not sought to take the oath of office and had made clear her intent not to cure the defect in her residency, the district court voided her election, but rather than finding Figueroa to have been legally elected instead, it declared a vacancy in the contested office of school board director. In Figueroa, we upheld the district court’s vacancy declaration, reasoning that notwithstanding Speers being unqualified for office, by not being successfully challenged prior to the election and by receiving the highest number of votes, she, rather than Figueroa, was legally elected. Id. at ¶ 12, 343 P.3d at 971.
¶12 In recounting the district court’s ruling, however, we noted its statement that the failure of the designated election official to confirm Speers’s residency prior to determining the sufficiency of Speers’s nominating petition was a failure to discharge her statutory duty, as contemplated by section 1-1-113(1), and therefore had Figueroa not “slept on his rights,” the certification of Speers to the ballot could have been challenged in the district court, pursuant to that provision, up to the end of election day. Id. at ¶ 6, 343 P.3d at 969. Although we also noted the availability of certain vehicles for judicial challenge prior to election day, we took pains to make clear that we expressed no opinion “as to whether section 1-1-113 could provide a definitive avenue to remove an unqualified candidate from the ballot after the five-day windows [of sections 1-4-501(3) and -909(1), C.R.S. (2015)] to challenge certification have passed.” Id. at ¶ 12 n.4, 343 P.3d at 971 n.4. In the case before us today, Carson and the other qualified electors sought a declaration, prior to the election and by the authority of section 1-1-113(1), to the effect that the designated election official violated her duty by wrongfully certifying Pitton to the ballot, as well as an order mandating that the clerk and recorder not count the votes cast in the election for Pitton.
¶13 The nature and scope of proceedings permitted by section 1-1-113(1) is clearly a matter of statutory interpretation. A statute finds meaning according to the legislative intent expressed in the language chosen for the statute by the legislature itself. People v. Jones, 2015 CO 20, ¶ 10, 346 P.3d 44, 48 (citing Pham v. State Farm Auto. Ins. Co., 2013 CO 17, ¶ 13, 296 P.3d 1038, 1043). When the language of a statute is susceptible of more than one reasonable interpretation, and is therefore considered ambiguous, or when there is conflicting language in different provisions, intrinsic and extrinsic aids may be employed to determine which reasonable interpretation actually reflects the legislative intent. Id. (citing Frank M. Hall & Co., Inc. v. Newsom, 125 P.3d 444, 448 (Colo. 2005)).
¶14 Among these interpretative aids are a number codified by the legislature to explain its own intent for resolving apparent conflicts among the statutes it has promulgated. See §§ 2-4-101 to -402, C.R.S. (2015). With regard to statutes, one of which treats an issue specifically while another can be said to govern it as a particular species of a more generic class, the legislature has prioritized its own preferences. Where a general statutory provision conflicts with a special or local provision, it should be construed, whenever possible, so that effect is given to both. § 2-4-205, C.R.S. (2015).[2] However, where the apparent conflict between such provisions proves to be irreconcilable, the special or local provision is to be understood as an exception to, and therefore as prevailing over, the general provision, unless the general provision is the later adoption and the manifest intent of the legislature is that the general provision prevail. Id. 
¶15 Section 1-1-113 does not purport to impose any duty or function upon any election official, but rather provides a procedural vehicle or method—in fact, except as
2 The provision provides, in full:If a general provision conflicts with a special or local provision, it shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail. § 2-4-205, C.R.S. (2015) (emphasis added).
otherwise provided in part 1 of article 1 of title 1 of the revised statutes, the exclusive method—for the adjudication of controversies arising from a breach or neglect of duty or other wrongful act that occurs prior to the day of an election. More particularly, as relevant to this case, it requires the district court, upon a finding of good cause, to issue an order requiring substantial compliance with the provisions of the election code whenever any eligible elector files a verified petition alleging that a person charged with a duty under the code has committed a breach or neglect of that duty or other wrongful act.
¶16 By contrast, section 1-4-501 actually does impose a duty on the designated election official not to certify the name of any candidate who fails to swear or affirm under oath that he or she will fully meet the qualifications of the office if elected and who is unable to provide proof that he or she meets any requirements of the office relating to, among other things, residence. In addition, however, subsection (3) of section 501 specifically provides for a challenge to the qualification of any candidate by an eligible elector within five days after the designated election official issues a statement certifying the candidate; and it sets out a very specific and abbreviated timeframe within which the district court must determine whether the candidate is or is not qualified for office.
¶17 To the extent that a candidate whose residence does not fall within the current boundaries of the district may be considered “unable to provide proof” that he meets the residency requirements of the office, and the designated election official who certifies that candidate to the ballot could be said, for that reason and that reason alone, to do so wrongfully and in breach of a duty with which she is charged, any such challenge to the actions of the designated election official in certifying the candidate necessarily rests on a successful challenge to the qualifications of that candidate. And to the extent that section 113, which clearly comprehends challenges to a broad range of wrongful acts committed by officials charged with duties under the code, comprehends a specific challenge to a designated election official’s certification of a candidate and the county clerk and recorder’s tabulation of validly-cast votes for him, for the sole reason that he was unqualified, section 113 stands in relation to section 1-4-501(3) as a general to a special, or specific, provision. Furthermore, because the former provision permits the adjudication of controversies arising from any wrongful act that occurs prior to the day of an election, without further limitation, while the latter provides a specific challenge to the qualification of a candidate if made by filing a verified petition with the district court within five days of his certification to the ballot, the two provisions very much appear to be in conflict.
¶18 The legislature’s own preference for resolving such an apparent conflict is to construe the statutes, whenever possible, to give effect to both. Any reading, however, that would either treat the five-day period of section 1-4-501(3) as other than a limitation on the time for filing a challenge to the candidate’s qualifications, or permit an elector to challenge a candidate’s qualifications indirectly through section 113 when he would be expressly barred from doing so directly by section 1-4-501(3), would effectively render the specific five-day provision simply superfluous, serving no purpose whatsoever. See § 2-4-201(1)(b), C.R.S. (2015) (“The entire statute is intended to be effective . . . .”); see also Qwest Corp. v. Colo. Div. of Prop. Taxation, 2013 CO 39, ¶ 16, 304 P.3d 217, 221 (citing Welby Gardens v. Adams Cty. Bd. of Equalization, 71 P.3d 992, 995 (Colo. 2003)) (“[W]e strive to interpret statutes in a manner that avoids rendering any provision superfluous.”). Because we do not believe effect can reasonably be given to both provisions and because section 113 is not the later adopted of the two, see ch. 258, sec. 8, § 1-1-113(1), 1993 Colo. Sess. Laws 1393, 1396 (amending and reenacting section 1-1-113(1)); ch. 187, sec. 27, § 1-4-501, 1995 Colo. Sess. Laws 819, 829–30 (adding subsection 1-4-501(3)), the legislative prescription for this conflict is to give effect to section 1-4-501(3), as the special, or more specific, provision.
¶19 Limiting pre-election challenges to the qualifications of a certified candidate in 
this way hardly leaves a gap in the election process or suggests a dilemma for which the legislature has failed to provide a solution. As we have already reasoned in Hanlen and Figueroa, the legislature expressly contemplated the situation in which an ineligible candidate could be elected, and it addressed that scenario, without allowing for disruption of the election process once underway, by providing for a post-election challenge to a winning candidate’s qualifications, resulting, if successful, in a vacancy in office rather than a declaration that the next-highest vote getter was legally elected. While our precise holdings in Hanlen and Figueroa may have been limited, our construction of the election scheme upon which those holdings rested clearly foreshadowed our resolution of today’s application.
¶20 Once a candidate who is ineligible to take office is certified to the ballot, without challenge, and the election is underway, there may simply be no cost-free solution. Rather than effectively disenfranchising those voting for a winning, but ultimately ineligible, candidate, or incurring the practical problems and expense of an entirely new election, the legislature has chosen, with its existing statutory scheme, to have a vacancy declared and, in the case of a school board director, have the vacancy filled by the currently sitting board. Apart from possible constitutional limitations, none of which has been asserted here, that choice belongs to the legislature.
III.
¶21 Because section 1-1-113(1), C.R.S. (2015), does not permit a challenge to an
election official’s certification of a candidate to the ballot, solely on the basis of the certified candidate’s qualification, once the period permitted by section 1-4-501(3), C.R.S. (2015), for challenging the qualification of the candidate directly has expired, the ruling of the district court is affirmed.
JUSTICE EID dissents.

JUSTICE EID, dissenting.
¶22 The majority finds an “irreconcilable conflict” between section 1-4-501(3), C.R.S. (2015), which requires challenges to an election official’s certification of a candidate to the ballot to be made within five days, and section 1-1-113, C.R.S. (2015), a catch-all provision that allows a challenge to be made at any time prior to the day of an election alleging that an election official “has committed or is about to commit a . . . wrongful act.” The majority concludes that the two provisions must conflict because to allow a challenge to a candidate’s qualifications under section 1-1-113—here, that the candidate is unquestionably unqualified because he lives outside the boundaries of the relevant district—after the section 1-4-501(3) five-day window has passed would render that window “superfluous.” Maj. op. ¶ 18. The two provisions can easily be read in harmony, however, as they provide different remedies at different times in the election process: if the ineligibility is determined to exist prior to certification, then the candidate’s name will not appear on the ballot; if discovered after certification, then the votes for that candidate will not be counted. In fact, it is the majority’s approach that does damage to the statute. Election officials must often perform duties by a particular deadline; after today, the wrongful performance of those duties cannot be challenged after that deadline—even where ineligibility is conceded. Because the majority deprives Colorado election law of an important enforcement tool, I respectfully dissent.
¶23 The General Assembly has given us instructions as to how to resolve potential conflicts between statutes: “If a general provision conflicts with a special or local provision, it shall be construed, if possible, so that effect is given to both.” § 2-4-205, C.R.S. (2015) (emphasis added). In other words, the legislature has anticipated that there will be conflicts between statutes, and we are to do whatever possible to construe the statutes harmoniously. It is only when the conflict is “irreconcilable” that we are to declare that the more specific provision governs over the general. Id.
¶24 The majority acknowledges this obligation to read statutes harmoniously if possible, maj. op. ¶ 14, but expends only minimal effort in attempting to read sections 1-1-113 and 1-4-501(3) so as to avoid an irreconcilable conflict. It suggests that permitting a challenge under the more general section 1-1-113 after the specific five-day deadline under section 1-4-501(3) has passed would render the five-day provision “superfluous, serving no purpose whatsoever.” Maj. op. ¶ 18. But that is simply not the case. Sections 1-4-501(3) and 1-1-113 tackle the same subject but at different times in the election cycle and with different remedies. Section 1-4-501(3) provides for accelerated review of a candidate’s qualifications prior to ballot certification; the remedy for a successful challenge is that an ineligible candidate’s name is not certified to the ballot. Section 1-1-113, by contrast, is a multipurpose provision that allows a challenge to any allegedly wrongful act that an election official has committed or is about to commit “prior to the day of an election.” The remedy for a successful challenge under section 1-1-113 is that the votes for the ineligible candidate are not counted. The two provisions can easily be read in harmony: section 1-4-501(3) governs ballot certification; section 1-1-113 governs thereafter and until election day.
¶25 The consequences of the majority’s “specific-general” rationale reach far beyond this case. The election code is replete with duties that election officials must perform at particular times, such as certifying candidates to the ballot. The whole purpose of section 1-1-113 is to provide a catch-all, generalized remedy for problems that arise up to election day, including challenges to a candidate’s eligibility. The majority’s reasoning—which requires such challenges be brought when the election official first performs the action, as opposed to when the wrongful character of that action is discovered—defeats the purpose of having such a catch-all provision. At the very least, the majority’s rationale substantially limits the usefulness of section 1-1-113 as a remedy.
¶26 Perhaps the true impetus behind the majority opinion, see maj. op. ¶¶ 9, 19, is our statement in Hanlen v. Gessler, 2014 CO 24, ¶ 44, 333 P.3d 41, 51, that the “statutory framework also reflects the legislature’s recognition that once ballots are printed and distributed, and voting is underway, the election process must be allowed to proceed, and any late-arising issues regarding a candidate’s eligibility are to be resolved through a post-election contest.” This statement, however, must be read in the context in which it was made—namely, that “the power to resolve issues regarding candidate eligibility resides with the courts,” not with election officials. Id. In fact, Hanlen could not have settled the issue we address today—that is, the availability of section 1-1-113 as a remedy for a late-discovered ineligibility—because we stated the question was an open one just last year in Figueroa v. Speers, 2015 CO 12, ¶ 12 n.4, 343 P.3d 967, 971 n.4 (“We make no judgment as to whether section 1-1-113 could provide a definitive avenue to remove an unqualified candidate from the ballot after the five-day windows to challenge certification have passed.”).

¶27 Following the lead of the district court, the majority takes our observation in Hanlen as creating a per se rule that no challenge can be made to a candidate’s eligibility once voting has begun. Such a per se rule simply does not appear in the Colorado election code. Moreover, such a reading puts tremendous, and problematic, emphasis on our phraseology “once ballots are printed and distributed, and voting is underway” as the limitation on section 1-1-113 challenges—again, a deadline not contained in any statute. Under the majority’s reading, a court considering a section 1-1-113 challenge must first determine whether “voting is underway” in the election before it. While the election code no doubt anticipates courts will resolve election disputes, see Hanlen, ¶ 44, 333 P.3d at 51, it is difficult to imagine that the legislature intended a court to rest its jurisdiction to hear a case on whether a single voter has cast a vote.
¶28 The majority suggests that the legislature made a “choice” to have the school board fill a vacancy created when an ineligible candidate is elected in order to avoid “effectively disenfranchising those voting for a winning, but ultimately ineligible, candidate.” Maj. op. ¶ 19. But having voters go to the polls to cast their votes for a candidate who cannot—as all concede—ever take office is hardly a robust view of the franchise. Under the section 1-1-113 remedy, election officials could inform voters that votes for the ineligible candidate would not be counted, thus enabling them to cast their votes for candidates on the ballot who actually could take office. While I entirely agree that it is up to the legislature to write the election code as it sees fit, within constitutional limits, maj. op. ¶ 19, I disagree that the legislature wrote it in a way that guts section 1-1-113 and limits voters’ ability to cast their vote for an eligible candidate. Accordingly, I respectfully dissent.